IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

THE PET STOP PROFESSIONAL PET SITTING
SERVICE, LLC, an Oregon corporation,

                 Plaintiff,

    v.

THE PROFESSIONAL PET-SITTING SERVICE,
Inc., an Oregon corporation; THOMAS
GENNARELLI, an individual; and KIMBERLEE
GENNARELLI, an individual,

                Defendants.

CV-07-0090-ST

FINDINGS AND
RECOMMENDATIONS

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, The Pet Stop Professional Pet Sitting Service, LLC ("Pet Stop"), brings this

action against defendants, The Professional Pet-Sitting Service, Inc. ("PPSS"), Thomas

Gennarelli ("Mr. Gennarelli"), and Kimberlee Gennarelli ("Ms. Gennarelli"), alleging four

claims:  (1) trademark infringement in violation of 15 USC § 1125 (First Claim); (2) trade dress

1 - FINDINGS AND RECOMMENDATIONS

infringement in violation of 15 USC § 1125 (Second Claim); (3) misappropriation of trade secrets in violation of ORS 646.463 and 646.465 (Third Claim); and (4) unfair trade practices in violation of ORS 646.608 (Fourth Claim).  First Amended Complaint ("FAC"), ¶¶ 20-60. Defendants, in turn, allege two counterclaims against Pet Stop for breach of contract and anticipatory repudiation.  This court has jurisdiction pursuant to 28 USC §§ 1331, 1338 and 1367.

The parties have filed cross-motions for summary judgment (dockets #39 & #42).  Pet Stop seeks summary judgment only on its First Claim for trademark infringement. Defendants seek summary judgment on Pet Stops' First and Second Claims and on their two counterclaims.[1] The parties have also filed multiple motions to strike (dockets #54, #65, #81) which are addressed in a separate Opinion and Order.  For the reasons that follow, the parties' motions for summary judgment should be granted in part and denied in part.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law."  The moving party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial."  *Balint v. Carson City*, 180 F3d 1047,

---

[1] Defendants state that Pet Stop intends to withdraw the Third and Fourth Claims.  However, Pet Stop has not yet formally move to dismiss these claims.

2 - FINDINGS AND RECOMMENDATIONS

1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steel Workers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F2d 626, 631 (9th Cir 1987).  The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted).  Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id* at 631.  "'Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena.'" *KP Permanent Make-Up, Inc.*, 408 F3d 596, 602 (9th Cir 2005), quoting *Entrepreneur Media, Inc. v. Smith*, 279 F3d 1135, 1140 (9th Cir 2002)

## UNDISPUTED FACTS

The facts of this case center around a failed business deal between Michelle and Patrick Sheehan, the owners of Pet Stop, and Thomas and Kimberlee Gennarelli, the owners of PPSS.

Michelle Sheehan ("Ms. Sheehan") began a pet-sitting business in the Portland, Oregon, area in August 1996, for which she obtained a business license, designating the company's name as The Pet Stop.  M. Sheehan Decl. (docket #45), ¶¶ 1-2 & Ex. 1.  She operated this business until January 1999 when she moved to Salem, Oregon.  *Id*, ¶ 3.  In June 2001, Ms. Sheehan formed Pet Stop Professional Pet Sitting Services, Inc. to provide pet-care services in the Salem area.  She reformed it as an LLC in September 2001.  *Id*, ¶ 5.  Ms. Sheehan claims that since its

formation, Pet Stop has used "The Pet Stop" and "Pet Stop Professionals" as its trademarks.  *Id*,
¶¶ 6-9.[2]

In the course of operating her business, Ms. Sheehan provided services to clients located
outside of Oregon and also advertised to prospective clients living outside of Oregon.  These out-
of-state business dealings included contacting clients traveling out of state to update them on
their pets' status; advertising her business through use of a webpage and by listing Pet Stop with
a national pet sitters' organization and various pet-sitter referral services; and communicating
with numerous potential customers outside of Oregon who desired pet-sitting services in Oregon
at some future time.  *Id*, ¶¶ 10-14.  These communications used the marks "The Pet Stop" and
"Pet Stop Professionals."  *Id*, Exs. 3 & 4.

In 2006, the Sheehans decided to move to Central Oregon, and Ms. Sheehan began
discussing with various people her desire to sell Pet Stop.  *Id*, ¶ 15.  One person with whom she
discussed this desire was Ms. Gennarelli, her hair stylist.  *Id*; M. Sheehan Depo., pp. 99-100.
The Sheehans and the Gennarellis commenced contract negotiations and eventually settled on a
selling price of $50,000 and transfer date in August 2006.  Sheehan Decl., ¶ 17.  The Gennarellis
then paid a $5,000 deposit to Pet Stop.  *Id*.

However, the deal ultimately did not close in August, and the parties continued
negotiating on a variety of terms by email through September and October 2006.  K. Gennarelli

---

[2] Pet Stop has been inconsistent as to whether their second mark is "The Pet Stop Professional" or "Pet Stop
Professionals."  *Compare* FAC, § 23 *with* M. Sheehan Decl. (docket #45), ¶ 6.  Furthermore, the record indicates that the actual
mark used was "Your Pet Stop Professionals," and even this use was inconsistent; on occasion the mark appeared in singular
form as "Your Pet Stop Profesional."  *Compare* M. Sheehan Decl. (docket #45), Ex. 4, pp. 1-2 *with* pp. 3-4.  However, the
singular form only appears when referring to one of Pet Stop's employees.  When more than one employee is referenced in a
communication, the plural form is used.  Regardless of these various forms, Pet Stop now claims only "Pet Stop Professionals"
as its second mark.  Therefore, this court will address its analysis accordingly.

4 - FINDINGS AND RECOMMENDATIONS

Decl. (docket #80), Ex. 1.  In an email dated October 11, 2006, Ms. Sheehan outlined the terms

of the deal, including a January 1, 2007, transfer date, the amount due at signing ($30,000), and a

list of preparatory actions each party would need to take in anticipation of signing.  *Id*, p. 11.  On

October 18, 2006, the Gennarellis incorporated PPSS naming themselves as the only

shareholders.  K. Gennarelli Decl. (docket #40, Ex. 1), ¶¶ 2-4.  The Gennarellis chose the name

PPSS in anticipation of purchasing Pet Stop's business because it was similar to Pet Stop's

corporate name.  Brown Decl., Ex. 3, p. 23 (Defendants' Response to Plaintiff's First Request for

Admissions to Defendants).

　　　　Another email dated October 31, 2006, indicates that the parties had an appointment to

sign a written contract on December 29, 2006, at which time the Gennarellis had to present a

cashier's check for the down payment in the amount of $30,000.  K. Gennarelli Decl. (docket

#80), Ex.1, p. 13.  The communication states: "I will be giving you all the business property

January 1, 2007 as we agreed.  I'll be servicing stops until midnight 12/31/06."  *Id*.  It also

permits the Gennarellis to begin contacting businesses Pet Stop worked with on December 1,

2006, to set up the various accounts necessary to begin operation of the business and gives a date

for the transfer of business accounts of December 1, 2006, effective January 1, 2007.  *Id*.

　　　　Then on November 4, 2006, Ms. Sheehan sent the following email to defendants:

> At this point, Patrick and I feel extremely uncomfortable with this
> business deal.
>
> If you want The Pet Stop we will no longer be able to take your payment
> installment plan.  We'll need the entire sum of $45,000.00 up front and by
> cashier's check only.  We want the transfer date now for Monday
> 12/11/06.  It's no longer worth it to figure out how or why you and Kim
> are playing us and this situation out like this.

5 - FINDINGS AND RECOMMENDATIONS

> If this is unacceptable, please let me know and I'll refund your $5,000.00 deposit when you return our property we have loaned you on deposit including all documents, gift certificates and other items.

K. Gennarelli Decl. (docket #80), Ex. 1, p. 14.

The Gennarellis rejected the new proposed terms and demanded their deposit back.

K. Gennarelli Decl. (docket #68), Ex. 3, p. 5.

Ms. Sheehan gave the Gennarellis a check for $5,000 on November 10, 2006, but stopped payment before they could cash it. *Id*, ¶ 7, Ex. 3, p. 7. She stopped payment apparently due to her concern that PPSS was using a similar trade name, potentially infringing on Pet Stop's trademarks, and possibly competing for Pet Stop's customers. *Id*, pp. 9-10. On November 11, 2006, Ms. Sheehan offered the Gennarellis two options with respect to their deposit: (a) continue using the PPSS trade name and Pet Stop's documents in exchange for the $5,000 deposit; or (b) obtain a refund of the $5,000 deposit and refrain from using any portion of Pet Stop's trade name and concepts, sign a non-compete, and promise to never use Pet Stop's documents or pursue Pet Stop's customers. *Id*, p. 10. The Gennarellis denied any intent to take Pet Stop's business or customers and responded that they accepted the second option "so long as this check clears." *Id*, p. 11.

Ms. Sheehan then made one final last-ditch effort to revive the deal on terms nearly identical to those proposed on November 4, 2006, adding that Ms. Sheehan could keep 12 clients of her choosing. *Id*, p. 12. The Gennarellis did not accept this proposal and continued to demand their deposit back. *Id*, p. 14. In mid-November 2006, Ms. Sheehan engaged in an instant message conversation with Mr. Gennarelli regarding the deposit and the circumstances of their soured business relationship. M. Sheehan Decl. (docket #45), ¶ 21 & Ex. 6. On November

18, 2006, the Gennarellis threatened legal action if they did not receive their deposit by November 30, 2006.  K. Gennarelli Decl. (docket #68), Ex. 3, p. 14.  Ms. Sheehan responded by communicating her intent to counter sue for "common-law copyright/trademark infringement." *Id*, p. 15.  Nevertheless, Ms. Sheehan refunded the deposit on November 19, 2006, and the Gennarellis returned a compact disc containing the forms Ms. Sheehan had shared with them in anticipation of the sale.  M. Sheehan Decl. (docket #45), ¶¶ 21-22; T. Gennarelli Decl. (docket #63), ¶ 3.  The parties never signed a non-compete agreement.  K. Gennarelli Decl. (docket #68), ¶ 9.

Throughout December 2006, Ms. Sheehan noticed defendants using "Pet Stop Pros" and "The Professional Pet Sitting Service" in advertisements and displayed on a vehicle.  M. Sheehan Decl. (docket #45), ¶¶ 23-24 & Ex. 7.  In January 2007, the Gennarellis received a demand letter to stop conducting infringing activities.  K. Gennarelli Decl. (docket #40, Ex. 1), ¶ 8; K. Gennarelli Decl. (docket #68), ¶ 13.  In response, over the next several weeks PPSS discontinued its use of the term "pet stop pros" in all forms, including removing stickers from vehicles used in the course of its business, and stopping the use of the email address "petstoppros@aol.com" and the domain name "www.petstoppros.com."  K. Gennarelli Decl. (docket #40, Ex. 1), ¶¶ 8-9; K. Gennarelli Decl. (docket #80), ¶¶ 9-13; K. Gennarelli Decl. (docket #68), ¶¶ 15-22 .

In August 2007, the Gennarellis sold all of the assets of PPSS and ceased all pet-sitting activities.  K. Gennarelli Decl. (docket #40, Ex. 1), ¶ 10; K. Gennarelli Decl. (docket #80), ¶ 15.  They disclaim any intention of resuming a pet-sitting business.

The Pet Stop no longer provides pet-sitting services in Salem.  P. Sheehan Depo., p. 38.

7 - FINDINGS AND RECOMMENDATIONS

## FINDINGS

### I.    Trademark Claim (First Claim)

Pet Stop's First Claim alleges that defendants' use of the marks "Pet Stop Pros" and "Professional Pet Sitting Service" infringes on Pet Stop's use of its marks "The Pet Stop" and "Pet Stop Professionals" in violation of Section 43(a) of the Lanham Act.  15 USC § 1125(a). Both parties have moved for summary judgment on this claim.  For the reasons that follow, both motions should be denied.

#### A.    Legal Standards

Under the Lanham Act, a trademark includes "'any word, name, symbol, or device or any combination thereof' used by any person 'to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.'"  *Two Pesos, Inc. v. Taco Cabana*, *Inc.*, 505 US 763, 768 (1992) ("*Taco Cabana*"), quoting 15 USC § 1127.   "The Lanham Act was intended to make 'actionable the deceptive and misleading use of marks' and 'to protect persons engaged in . . . commerce against unfair competition.'"  *Id* at 767-68, quoting 15 USC § 1127 (ellipsis in original).  The Act protects both those marks which are registered and those that are unregistered, and "it is common ground that . . . the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection . . . ."  *Id* at 768.

In order to establish a claim for trademark infringement under the Lanham Act, a plaintiff must show that:  (1) it has a valid protectable mark; and (2) the defendant's alleged infringement creates a likelihood of confusion between the competing marks.  15 USC § 1125(a); *Surfvivor*

*Media, Inc. v. Survivor Prods.*, 406 F3d 625, 630 (9th Cir 2005). To be protectable, an applicant's "mark must be capable of distinguishing the applicant's goods from those of others." *Taco Cabana*, 505 US at 768. Thus, a mark may be "protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning." *Id* at 769 (emphasis in original) (citation omitted). Conversely, a mark that is generic is not protected by the Act. 15 USC § 1064 (3); *see also Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 US 189, 193-94 (1985). Where the plaintiff proves that it has a valid protectable mark, the Lanham Act provides a federal claim for infringement which "is triggered by a use which 'is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association' of the user with the senior user." 4 J. Thomas McCarthy, TRADEMARKS AND UNFAIR COMPETITION, § 23:1 (4th ed. 1996) (Rel. 45, 03/2008) ("MCCARTHY"), quoting 15 USC § 1125(a).

To help determine whether a mark is sufficiently distinctive to merit protection, the cases identify five categories of trademarks, listed in ascending order of distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary and (5) fanciful. *Taco Cabana*, 505 US at 768; *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F3d 925, 927 (9th Cir 2005).

"A generic," or common descriptive, "term is one that refers, or has come to be understood as referring, to the genus of which the particular product or services is a species. It cannot become a trademark under any circumstances." *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F3d 1143, 1147 (9th Cir 1999), quoting *Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F2d 1011, 1014 (9th Cir 1979). It is "the name of the product or service itself-what [the product] is and as such . . . the very antithesis of a mark." *Id*, quoting 2

9 - FINDINGS AND RECOMMENDATIONS

MCCARTHY, § 12:1.  A generic mark may never become a trademark as the two terms "are

mutually exclusive;" "the function of a mark is to identify and distinguish the goods or services

of one seller from those sold by all the others," and by definition a generic term identifies only

the good or service.  2 MCCARTHY, § 12:1.

A "descriptive," or "merely descriptive," term is one which, not surprisingly, describes

the product or service to which it applies.  *Taco Cabana*, 505 US at 769; *Filipino Yellow Pages*,

198 F3d at 1147.  Descriptive terms "directly and immediately convey[] some knowledge of the

characteristics of a product or service."  2 MCCARTHY, § 11:16, citing *In re MBNA Am. Bank,*

*N.A.*, 340 F3d 1328 (Fed Cir 2003), *reh'g and reh'g en banc denied*.  Although not inherently

distinctive, a descriptive term may nonetheless receive trademark protection where "it has

acquired 'secondary meaning' in the minds of consumers, *i.e.*, it has 'become distinctive of the

[trademark] applicant's goods in commerce.'"  *Filipino Yellow Pages*, 198 F3d at 1147, quoting

*Abercrombie & Fitch Co., v. Hunting World, Inc.*, 537 F2d 4, 10 (1976) (alteration in original).

A descriptive mark acquires secondary meaning when "in the minds of the public, the primary

significance of [the mark] is to identify *the source* of the product rather than *the product* itself."

*Wal-Mart Stores, Inc. v. Samara Bros., Inc. ("Wal-Mart")*, 529 US 205, 211 (2000) (emphasis

added), quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 US 844, 851 n11 (1982).

The final three categories of marks are considered inherently distinctive due to the fact

that their "'intrinsic nature serves to identify a particular source,'" and thus are protectable

without a showing of secondary meaning.  *Id* at 210-11, quoting *Taco Cabana*, 505 US at 768.

"Suggestive" marks "[suggest] rather than [describe] an ingredient, quality, or characteristic of

the goods and requires imagination, thought, and perception to determine the nature of the

10 - FINDINGS AND RECOMMENDATIONS

goods." *Surgicenters*, 601 F2d at 1014-15. "An arbitrary mark consists of a word or symbol that is in common usage in the language, but is arbitrarily applied to the goods or services in question in such a way that it is not descriptive or suggestive." 2 MCCARTHY, § 11:4. Finally, "[a] fanciful mark is a word that is coined for the express purpose of functioning as a trademark." *Id*; *see also Abercrombie*, 537 F2d at 11 n12 (describing arbitrary and fanciful marks). These marks "[enjoy] all the rights accorded to suggestive terms without the need of debating whether the term is 'merely descriptive' and with ease of establishing infringement." *Surgicenters*, 601 F2d at 1015, citing *Abercrombie*, 537 F2d at 11.

### B.  Burden of Persuasion

Where a mark is not federally registered, and the defendant asserts genericness as a defense, the plaintiff has the burden of proving the mark is not generic. *Filipino Yellow Pages*, 198 F3d at 1146. Whether a mark is generic is a question of fact which may be decided as a matter of law where there are no genuine issues for a trier of fact to resolve. *Rudolph International, Inc v. Realys, Inc.*, 482 F3d 1195, 1199 (9th Cir 2007).

### C.  Analysis

#### 1.  Protectability

##### a.  Priority of Use

Defendants argue that in order to bring an infringement claim, Pet Stop must prove it was the first to use its claimed marks in commerce. Defendants quote *Sengoku Works Ltd v. RMC Int'l, Ltd.*, 96 F3d 1217, 1219 (9th Cir 1996), for the proposition that "[t]o acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or

services." Pet Stop responds that as long as other prior users of its marks operate in separate markets wholly remote from Pet Stop, Pet Stop may claim ownership of its mark for the services it provided in Salem, Oregon.

While the general rule in trademark law is "first-in-time, first-in-right," there are several exceptions. One exception is the *Tea Rose-Rectanus* doctrine set forth in *Hanover Star Milling Co. v. Metcalf*, 240 US 403 (1916) (the "Tea Rose" case), and *United Drug Co. v. Theodore Rectanus Co.*, 248 US 90 (1918). That doctrine recognizes that "priority of use in one geographic area within the United States does not necessarily suffice to establish priority in another area." *Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F3d 1088, 1096 (9th Cir 2004). "Thus, the first user of a mark will not necessarily be able to stop a subsequent user, where the subsequent user is in an area of the country 'remote' from the first user's area," with "[t]he practical effect . . . that one user may have priority in one area, while another user has priority over the very same mark in a different area." *Id* at 1096.

To determine whether the doctrine protects a junior user from an infringement action brought by the senior user, a court must analyze the extent to which a senior user's mark has gained secondary meaning in the geographical location of the junior user. *Id* at 1097. This analysis is unnecessary here because defendants do not claim to be senior users of the marks at issue. Instead, they rely on prior use by third parties.

It is well established that a "a third party's prior use of a trademark is not a defense in an infringement action." ; *Comm. for Idaho's High Desert v. Yost*, 92 F3d 814, 820 (9th Cir 1996). This rule arises from the fundamental doctrine in property law that "[p]ossession is title against

12 - FINDINGS AND RECOMMENDATIONS

all the world but the true owner." *Id* (citation omitted).  As stated by a preeminent commentator on the law of trademarks:

> [A third party's rights] should not be allowed as a defense in any trademark case.  So long as plaintiff proves rights superior to defendant that is enough.  Defendant is no less an infringer because it is brought to account by a plaintiff whose rights may or may not be superior to the whole world.  Plaintiff's speculative dispute with a third party does not concern the defendant.

*Id* at 821, quoting McCarthy, § 31.39[4] (3d ed).

This rule applies with equal force to defendants' argument.  Because defendants concede that Pet Stop is the senior user of its marks as between the parties to this case, they cannot defeat Pet Stop's infringement claim by challenging its priority as against third parties who may have superior rights to the marks.

///

///

///

### b.    <u>Genericness</u>

Defendants contend that both of Pet Stop's trademarks[3] ("The Pet Stop" and "Pet Stop Professionals") are generic and, therefore, not protectable.  Pet Stop argues that its marks are suggestive and, therefore, inherently distinctive, or, in the alternative, are descriptive marks with acquired secondary meaning.

---

[3] Because Pet Stop does not market a good, but provides services, their marks are more accurately defined as "service marks."  *See* 15 USC § 1127 (defining, among other things, "service mark").  However, "identical standards" govern infringement suits based on either type of mark.  *Nutri/System, Inc. v. Con-Stan Indus., Inc.*, 809 F2d 601, 604 (9th Cir 1987) (citations omitted).

To determine whether a registered mark has become generic, the Lanham Act states that "[t]he primary significance of the registered mark to the relevant public rather than purchaser motivation shall be the test."  15 USC § 1064(3).  Applying this test, "if buyers take the word to refer only to a particular producer's goods or service, it is not generic.  But if the word is identified with all such goods or services, regardless of their suppliers, it is generic." *Surgicenters*, 601 F2d at 1016 (citation omitted).  Thus, a mark is not generic if "'the primary significance of the term in the minds of the consuming public is not the product but the producer.'"  *Anti-Monopoly, Inc. v. Gen. Mills Fun Group*, 611 F2d 296, 302 (9th Cir 1979), quoting *Kellogg Co. v. Nat'l Biscuit Co.*, 305 US 111, 118 (1938).  In other words, the mark "refers to, or has come to be understood as referring, to the genus of which the particular product or service is a species." *Filipino Yellow Pages*, 198 F3d at 1147.

The Ninth Circuit has adopted several rules to aid the analysis.  First, under the "anti-dissection rule," this court must evaluate the genericness of the mark as a whole.  *See Filipino Yellow Pages*, 198 F3d at 1149-50 (discussing rule).  Under this rule, a term is not generic merely because it is comprised of several generic terms.  *Yost*, 92 F3d at 821.  The Ninth Circuit also employs the "who-are-you/what-are-you" test:  "'A mark answers the buyer's questions 'Who are you?' 'Where do you come from?' 'Who vouches for you?' But the [generic] name of the product answers the question 'What are you?'"  *Filipino Yellow Pages*, 198 F3d at 1147, quoting *Official Airline Guides*, 6 F3d at 1391 (alteration in original).

### i.        "The Pet Stop" mark

Defendants argue that the term "pet stop" has become the generic term for the services provided by Pet Stop in the pet-sitting industry.  However, a "pet stop" is not the genus of

services of which Pet Stop's service is a species.  The genus of services at issue could be termed animal or pet care, or alternatively, pet-sitting or pet-boarding (although these two terms seem to be more descriptive in nature).  Pet Stop is a provider of these services and seeks to associate the term "The Pet Stop" with a particular species of in-home animal care which is distinguished by the particular quality and care put into the variety of services it provides.  "The Pet Stop" does not answer the question "What are you?"

If "The Pet Stop" is a protected mark, then Pet Stop's competitors may still refer to their services by their generic or descriptive names or by a nearly endless variety of other marks. Granting Pet Stop protection for its use of "The Pet Stop" in no way gives it an effective monopoly in the field of in-home pet care by removing terms from the lexicon of generic or descriptive terms which are required by its competitors to properly describe their services.

As evidence of genericness, defendants offer the printouts of webpages of about 15 businesses which either have "pet stop" as a component of their name, or use the term to describe a specific service which includes some combination of providing a person's pet with food and water, walking or playing with a pet, letting a pet outside, or administering medications to a pet.  Swider Decl., Exs. 15 & 17.  This evidence is hearsay and inadmissible for this purpose.  Therefore, defendants' argument fails for lack of proof.  Even if it were admissible, this evidence only supports the fact that a number of businesses may use this term, which says nothing about whether the term has become the common descriptive name used by the consuming public in seeking pet-sitting or related services.

Additionally, a search for the term "pet stop" on the USPTO Trademark Electric Search System" results in multiple listings for registered marks which include "pet stop." *See* Swider

Decl. (docket #69), ¶ 6 & Ex. 4.  These include Pet Stop Pet Fence Systems which sells "[e]lectrical underground fencing for animal containment" (perhaps the most literal use possible for this term); mypetstop.com which describes its goods and services as "[c]omputer services, namely information and advisory services provided on-line by means of a global computer network in the field of pets and pet care;" and Pet Stop (with a paw print graphic encased in an octagon between the two words), another provider of electrical pet fences.

In sum, the record contains no evidence that consumers of pet-sitting and in-home pet-care services identify the term "pet stop" with the overall type of service they seek when they call a company like Pet Stop.  Therefore, based on the undisputed evidence, this court finds that the mark "The Pet Stop" is not generic.

///

///

### ii.      **"Pet Stop Professionals" mark**

Plaintiff also claims the use of the mark "Pet Stop Professionals" as a mark separate and distinct from "The Pet Stop."  The same analysis for "The Pet Stop" applies to "Pet Stop Professionals."  This mark does not identify, in the minds of consumers, the product or service provided by Pet Stop.  Rather, it identifies a particular provider of the service.  The addition of the term "professionals" does not convert the non-generic mark "Pet Stop" into a generic one.

### c.      **Descriptive or Suggestive**

Having determined that Pet Stop's marks are not generic, this court must next determine whether its marks are distinctive, either inherently or as a result of having acquired secondary meaning.  Neither "The Pet Stop" nor "Pet Stop Professionals" qualify as arbitrary or fanciful

marks.  They are not made-up "coined" terms and do not apply already existing terms in an

arbitrary fashion.  Pet Stop's marks have some degree of relationship to the nature of the services

they provide.  The strength of this relationship is determinative of whether the marks receive

presumptive protection as inherently distinctive (suggestive), or whether due to a much closer

relationship (descriptive), a showing of acquired secondary meaning is necessary.

A "descriptive" mark is one that "define[s] qualities or characteristics of a product in a

straightforward way that requires no exercise of the imagination to be understood."  *Kendall-

Jackson Winery v. E. & J. Gallo Winery*, 150 F3d 1042, 1047 n8 (9th Cir 1998).  But, "[i]f a

consumer must use imagination or any type of multistage reasoning to understand the mark's

significance, then the mark does not *describe* the product's features, but *suggests* them."  *Id*

(emphasis in original).  Under this "imagination test," ""[i]f the mental leap between the word

and the product's attribute is not almost instantaneous, this strongly indicates suggestiveness, not

direct descriptiveness.'"  *Self-Realization Fellowship Church v. Ananda Church of Self-

Realization*, 59 F3d 902, 911 (9th Cir 1995), quoting 1 MCCARTHY § 11:21 (3d ed. 1991) (§

11:67 in 4th ed), *cert denied*, 531 US 1126 (2001).  Conversely, "whenever a word or phrase

naturally directs attention to the qualities, characteristics, effect, or purpose of the product or

service, it is descriptive and cannot be claimed as an exclusive trade name."  *Vision Center v.

Opticks, Inc.*, 596 F2d 111, 116 (5th Cir 1979) (citation omitted), *cert denied*, 444 US 1016

(1980); *accord* 2 MCCARTHY, § 11:16 (a mark is descriptive "if it is descriptive of:  the intended

purpose, function or use of the goods, the size of the goods, the provider of the goods or services,

the class of users of the goods or services . . . , a desirable characteristic of the goods or services .

. . , the nature of the goods or services . . . , or the end effect on the user.") (footnotes omitted).

17 - FINDINGS AND RECOMMENDATIONS

### i.     **"The Pet Stop"**

It is apparent that "The Pet Stop" is a suggestive term.  It does not immediately indicate

that Pet Stop provides in-home pet-care and pet-sitting services.  Rather it requires a multistage

reasoning process to come to this conclusion.  The Pet Stop helped consumers in this process by

defining a "pet stop" on the FAQ page of its website:

> **1. What exactly is a "pet stop"?**
> **Answer:** A pet stop is illustrated as a visit to the client home to serve a pet-
> sitting or dog-walking account.  During that time our Pet Stop professional
> will perform all of the required and requested duties to properly care for
> your pet in their home environment.  Hence our business name "The Pet
> Stop"!

Swider Decl. (docket #40), Ex. 9, p. 36.

///

### ii.     **"Pet Stop Professionals"**

Similarly, "Pet Stop Professionals" is a suggestive mark.  If consumers do not

immediately associate "The Pet Stop" with the services provided by Pet Stop and its competitors,

they would be hard-pressed to associate "Pet Stop Professionals" with the service.  While

"professional" does describe the quality of the service, a consumer must still employ imagination

or multi-stage reasoning to determine the skill Pet Stop's professionals are performing.  In other

words, the addition of the term "professionals" does not render the mark descriptive because it

does not answer the question, "what is a pet stop?"

### d.     **Conclusion**

Pet Stop's marks are not generic or descriptive of their services, but instead suggest the type of services Pet Stop provides.  Because they are suggestive, Pet Stop's marks are entitled to protection under the Lanham Act against uses by a competitor that are likely to cause confusion.

### 2.    Likelihood of Confusion

#### a.    Legal Principles

Pet Stop must next show a likelihood of confusion between its protectable marks and those used by defendants.  Likelihood of confusion is a question of fact.  *Levi Strauss  & Co. v. Blue Bell, Inc.*, 778 F2d 1352, 1352 (9th Cir 1985).  The test is "whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks."  *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F3d 1127, 1129 (9th Cir 1998).  Thus, "[l]ikelihood of confusion exists when 'customers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.'"  *Kendall-Jackson Winery*, 150 F3d at 1048, quoting *Fuddruckers, Inc. v. Doc's B. R. Others, Inc.,* 826 F2d 837, 845 (9th Cir 1987).

The Ninth Circuit has established a non-exclusive list of factors district courts may use in considering whether likelihood of confusion exists:

> 1. strength of the mark;
> 2. proximity of the goods;
> 3. similarity of the marks;
> 4. evidence of actual confusion;
> 5. marketing channels used;
> 6. type of goods and degree of care likely to be exercised by the purchaser;
> 7. defendant's intent in selecting the mark; and
> 8. likelihood of expansion of product lines.

*AMF Inc. v. Sleekcraft Boats*, 599 F2d 341, 348-49 (9th Cir 1979).

19 - FINDINGS AND RECOMMENDATIONS

Until recently, this multi-factor analysis applied only when the products or services were related, but not directly competing. *Id* at 348; *see also*, *Official Airline Guides, Inc. v. Goss*, 6 F3d 1385, 1391 (9th Cir 1993) ("The eight factor test applies when the products are related but *not* in direct competition") (emphasis in original). When the alleged infringer's products or services directly competed with the plaintiff's, the rule was that "infringement usually will be found if the marks are sufficiently similar that confusion can be expected." *Sleekcraft*, 599 F2d at 348.

However, in a recent decision, the Ninth Circuit reversed a district court's grant of summary judgment, in part due to the fact that "the district court relied on the dissimilarity of the marks alone to determine that no likelihood of confusion existed." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F3d 628, 632, 637 (9th Cir 2008). Both companies sold miniature diecast toy cars, trucks, and other vehicles, and the particular marks at issue concerned several lines of these toys. Despite these facts, the court did not analyze whether the two parties competed with each other. Instead, it held that a likelihood of confusion could not be established solely by reference to the similarity of marks, a holding at apparent odds with the teaching of *Sleekcraft*.

In reaching its conclusion, the court seemed particularly concerned with the fact that placing too much focus on one factor may result in the "possibility that persuasive evidence of a particular factor may be considered at the expense of relevant evidence of others." *Id* at 633. Therefore, in an abundance of caution, this court will analyze all the *Sleekcraft* factors. In doing so this court takes into consideration the Ninth Circuit's caution against "excessive rigidity" in applying the test. *Id* at 632.

      **b.**     **Analysis of the factors**

      **I.**     **Strength of the mark**

Because "a strong mark is inherently distinctive . . . it will be afforded the widest ambit of protection from infringing uses." *Sleekcraft*, 599 F2d at 349.  Arbitrary and fanciful marks are deserving of this robust protection. *Id.*  Suggestive marks, on the other hand, are "comparatively weak mark[s]." *Id*.  Thus, "only if the marks are quite similar, and the goods closely related, will infringement be found." *Id* at 350.  Because Pet Stop's mark is on the weak end of spectrum, this factor weighs against a likelihood of confusion.

### ii.    Proximity

Proximity refers to how closely the goods or services offered by the parties are related to each other. *Id* at 350.  "Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *Brookfield Comm., Inc. v. West Coast Entm't Corp.*, 174 F3d 1036, 1055 (9th Cir 1999).  Therefore, "a diminished standard of similarity is . . . applied when comparing the marks of closely related goods." *Official Airline Guides*, 6 F3d at 1392.  During the relevant time period, Pet Stop and PPSS provided essentially the same services (pet-sitting and in-home pet care) and competed for customers in the same city.  Therefore, this factor weighs in favor of a likelihood of confusion.

### iii.    Similarity of the marks

"[T]he greater the similarity between the two marks at issue, the greater the likelihood of confusion." *GoTo.Com, Inc. v. Walt Disney Co.*, 202 F3d 1199, 1206 (9th Cir 2000).  Therefore, this factor "has always been considered a critical question in the likelihood-of-confusion analysis." *Id* at 1205.  The similarity of the parties' marks "is tested on three levels: sight, sound, and meaning." *Sleekcraft*, 599 F2d at 351.  "[M]arks must be considered in their entirety and as

they appear in the marketplace," and "[s]imilarities are weighed more heavily than differences." *Official Airline Guide*s, 6 F3d at 1392 (citations omitted).

Obviously, one of defendants' marks, "Pet Stop Pros,"  is very similar to the marks claimed by Pet Stop.  However, its other mark, "The Professional Pet-Sitting Service," is not similar to either of Pet Stop's marks.  At the level of sight, the only commonalities are the terms "professional" and "pet."  With respect to sound, they have a similar alliterative quality in the use of "P" and "S."  However, their meaning is in stark contrast.  Defendants' mark claims that PPSS's services are professional when it comes to "pet-sitting," a term which is descriptive of the services provided by PPSS.  In contrast, Pet Stop's mark indicates that it is professional at pet stops, which, as has already been discussed, is only suggestive of the services it performs.  A consumer viewing "The Professional Pet-Sitting Service" knows immediately the types of services PPSS provides, whereas a consumer viewing Pet Stop's marks must engage in a multi-step reasoning process to associate the term "pet stop" with any particular service.  While both marks suggest that their respective services have something to do with pets and professionals, a consumer looking solely at their marks would not necessarily conclude that they provide similar services.

In sum, this factor weighs in favor of a likelihood of confusion with respect to the mark "Pet Stop Pros," but weighs against such a finding respect to the mark "The Professional Pet-Sitting Service."

### iv.    Evidence of actual confusion

"Evidence of actual confusion is strong evidence that future confusion is likely, but the absence of such evidence is not dispositive."  *Official Airline Guides*, 6 F3d at 1393 (internal and

external citations omitted).  Even where such evidence exists, it may be discounted where it is

"unclear or insubstantial."  *Sleekcraft*, 599 F2d at 352; *see e.g.*, *Surfvivor*, 406 F3d at 629, 633

("scant" evidence of actual confusion where plaintiff received no complaints from confused

customers and a survey showed that fewer than 2% of 402 purchasers of competitors product

were confused); *Official Airline Guides*, 6 F3d at 1393 (where plaintiff received only seven of

defendant's listing forms, out of 80,000 mailed to potential customers, evidence of confusion was

"de minimis" and not persuasive on issue of actual confusion).

Pet Stop has submitted the declarations of four individuals who allegedly were confused

by defendants' marks in the marketplace.  Two of these persons presented coupons to Pet Stop

which were taken from advertisements in a local newspaper actually placed by defendants.

Cornish Decl., ¶¶ 2-3; Puglisi-Babe Decl., ¶¶ 2-3.  Christy Cornish states that when she presented

the coupon to Ms. Sheehan, "[s]he explained it wasn't her business and it was for another

company with a similar name, The Professional Pet-Sitting Service, Inc."  Cornish Decl., ¶ 2.

Ellen Puglisi-Babe states that she "noticed a coupon in a local free newspaper" and "thought the

coupon was for Ms. Sheehan's business, so [she] cut it out," but when she presented the coupon

to Ms. Sheehan, "Ms. Sheehan informed [her] that the coupon was not for her business; rather, it

was for another business with a similar name."  Puglisi-Babe Decl., ¶¶ 2-3.

Another individual, Jason Harris, states that he "noticed a prominent advertisement" in a

local newspaper for "The Professional Pet-Sitting Service" which "gave an email address that was

very similar to Ms. Sheehan's email address."  Harris Decl., ¶ 2.  "Because of the similarity of the

name of the business and the email address," Harris thought that the ad was for Pet Stop.  *Id*, ¶ 2.

His statement continues: "When I mentioned to Ms. Sheehan, that I had seen her ad . . ., she told me that the ad was not for her business, but for a business with a similar name." *Id*, ¶ 3.

Finally, Patty Landers recounts that a woman she met at her veterinarian pointed out some fliers for the woman's pet-sitting business. Landers Decl., ¶ 1. Later, when Landers sought to contact the woman to inquire about her services, she could not find the flyer. She looked in the telephone book and found a business "that sounded like the name of the business owned by the women I met at the vet . . . The Pet Stop Professional Pet Sitting Service. " *Id*, ¶¶ 2-3. Landers contacted Ms. Sheehan and explained that she was the person Ms. Sheehan had met at the veterinarian's office. *Id*, ¶ 3. Ms. Sheehan responded that she had not met Landers and that Landers "must have met the owner of a business with a similar name, The Professional Pet-Sitting Service, Inc." *Id*, ¶ 4. Nevertheless, Landers decided to use Sheehan's service because it was located in her neighborhood. *Id*.

Evidence that four consumers may have mistaken advertisements or the names of the two competitors is some evidence of actual confusion. However, this evidence is weak at best. With respect to the coupons, neither consumer specifically identifies what component of the advertisement led them to believe that it was for Pet Stop. It is impossible to tell whether it was the use of a particular mark that caused the confusion or some other part of the advertisement.

Landers' identification of Pet Stop's ad in the telephone book suffers from the same lack of specificity. Moreover, the fact that Landers located Pet Stop's telephone number when trying to recall the name of the business obtained at her veterinarian does not necessarily demonstrate that she was confused by the marks employed by PPSS. Rather, she could merely have been mistaken as to the name. Furthermore, she does not explain what specifically led her to believe

that "The Pet Stop" was the name of the business she sought or why she confused it with the name of the business she was looking for, "The Professional Pet-Sitting Service."

Finally, Harris's declaration does not even demonstrate that he was a consumer looking for pet-care services. Rather, he admits that he performs web-design services for Pet Stop and merely mentioned his observation of an advertisement he saw in a paper. He does not explain the context of the advertisement or for what purpose he contacted Ms. Sheehan. Furthermore, as her web-designer, he would be intimately familiar with the information on her website, including her email address. Given this close relationship, it strains credulity to believe he would have mistaken the email address given by PPSS (petstoppros@aol.com) and that used by Pet Stop (salempetsitter@aol.com).

Three of the four persons experienced some level of confusion between Pet Stop and PPSS in the course of locating pet-care services. However, it is impossible to tell from their declarations whether this was specifically caused by the two marks used by PPSS which Pet Stop challenges as infringing. Presumably it was the name of the business that caused the confusion, but in all three cases this explanation was provided to the consumers by Ms. Sheehan and is not probative of their actual reason for mistaking the businesses. Furthermore, Pet Stop's trade name, "The Pet Stop Professional Pet Sitting Service," is not at issue in this lawsuit. This leaves an issue of fact which this court cannot resolve on summary judgment. As a result, this element is neutral.

### v.    Marketing channels

"Convergent marketing channels increase the likelihood of confusion." *Official Airline Guides*, 6 F3d at 1393, quoting *Nutri/System, Inc. v. Con-Stan Indus., Inc.*, 809 F2d 601, 606 (9th

Cir 1987).  Pet Stop argues that both it and PPSS sold their services to pet owners in Salem,

advertise in local newspapers and in the telephone book, and stock flyers in the offices of Salem

area veterinarians.  Defendants respond that the primary method of marketing of pet-sitting and

pet-care services is not through traditional advertising, but through personal referrals; thus the

marketing channels were not identical.  K. Gennarelli Decl. (docket #68), ¶¶ 25-27.

Due to a material issue of fact on the degree of convergence in the parties' marketing

channels this factor is neutral.

### vi.    Degree of care exercised by consumers

"In assessing the likelihood of confusion to the public, the standard used by the courts is

the typical buyer exercising ordinary caution."  *Sleekcraft*, 599 F2d at 353.  Both parties argue

that the degree of care exercised by customers in their industry weighs in favor of their case.

However, other than the self-serving declaration of Ms. Gennarelli, neither party submits any

supporting evidence.  K. Gennarelli Decl. (docket #68), ¶ 27.  Nevertheless, it is logical to assume

that people who seek care for their animals, and consequently give the care provider access to

their home, exercise a heightened degree of care in selecting a service.  The fact that none of the

consumers who claimed to be confused by the presence of defendants' marks ever used

defendants' services supports this assumption.

In response, Pet Stop posits a scenario in which a party who dislikes a representative of

PPSS may mistakenly choose not to contact Pet Stop for services.  Although plausible, the record

contains no evidence of this occurring.  Thus, this element weighs against a finding of a

likelihood of confusion.

### vii.    Defendants' intent

26 - FINDINGS AND RECOMMENDATIONS

Evidence that the infringer intentionally or knowingly adopted a mark similar to another's is very persuasive evidence that a likelihood of confusion exists.  "[R]eviewing courts presume that the defendant can accomplish his purpose:  that is, that the public will be deceived."  *Sleekcraft*, 599 F2d at 354 (citations omitted).  Defendants admit to adopting the "Pet Stop Professional Pet-Sitting Service" mark with the knowledge that Pet Stop used similar marks.  Brown Decl. (docket #44), Ex. 3, pp. 22-23.  However, they maintain that they chose the name only in anticipation of their purchase of Pet Stop's business.  *Id.*  Defendants also admit that they used the mark "Pet Stop Pros" primarily as an email address ("petstoppros@aol.com") and domain name ("www.petstoppros.com").   However, it was Ms. Sheehan, during contract negotiations, who suggested that defendants use a similar sounding email address to that of Pet Stop.  K. Gennarelli Decl. (docket #80), Ex. 1, p. 11 ("Since many of the businesses will need new business cards and brochures by transfer date you could easily make a new AOL email address such as petstoppetsitting@aol.com or salempetstopprofessionals@aol.com . . . .").

Defendants continued their infringing uses after the sale fell through.  Pet Stop argues that defendants were aware of the fact that the use of "Pet Stop Pros" was infringing on its marks sometime in mid-November 2006.  Sheehan Decl. (docket #45), ¶ 21 & Ex. 6.  Defendants respond that they were not aware of any infringement until several months later, at which time they actively sought to remove the term "Pet Stop Pros" from all of their business materials and advertisements.  K. Gennarelli Decl. (docket #68) ¶¶ 14-22.  Given these conflicting accounts, an issue of fact exists as to whether the defendants knowingly infringed on the Pet Stop marks once the business deal fell through.  At this point, this factor is neutral.

### viii.    Likelihood of expansion

27 - FINDINGS AND RECOMMENDATIONS

Both Pet Stop and PPSS have ceased operating in Salem, Oregon.  Pet Stop expresses

concern that defendants are still free to start up the business again, but defendants disclaim any

such intent.  To show a likelihood of expansion, there must be a "strong possibility" that either

party will expand his business to compete with the other.  *Sleekcraft*, 599 F2d at 354.  There is no

dispute that both companies were in direct competition for a brief period in late 2005 and early

2006.  To the extent that Pet Stop seeks a remedy for the infringement that occurred during this

period, this factor is largely inapposite.   To the extent that Pet Stop seeks to prevent future

infringement, it has failed to demonstrate a strong possibility that PPSS will begin competing

again in any market Pet Stop decides to enter in the future.  Thus, this factor is neutral as to past

infringement and weighs against a finding of a likelihood of confusion in the future.

     **D.**     **Conclusion**

The Pet Stop has a protectable interest under the Lanham Act in its use of the marks "Pet

Stop"  and "Pet Stop Professionals."  However, because the majority of the *Sleekcraft* factors

either weigh against a finding of confusion, or are neutral on the issue, Pet Stop's motion for

summary judgment should be denied.  On the other hand, a number of the neutral factors require

resolution of issues of fact.  If a jury resolves these issues in favor of Pet Stop, then Pet Stop

could prevail on its claim for trademark infringement.  Therefore, defendants' motion for

summary judgment on Pet Stop's claim for trademark infringement also should be denied.

**II.**     **Trade Dress Claim (Second Claim)**

     **A.**     **Legal Standards**

Trade dress is "the 'total image of a product' and may include features such as size, shape,

color, color combinations, texture or graphics."  *Int'l Jensen, Inc. v. Metrosound USA, Inc.*, 4 F3d

819, 822 (9th Cir 1993), quoting *Vision Sports, Inc. v. Melville Corp.*, 888 F2d 609, 613 (9th Cir 1989).  Courts have long recognized, and Congress has affirmed, that the Lanham Act creates a cause of action for infringement of unregistered trade dress.  *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 US 23, 28-29 (2001), citing 15 USC § 1125 (a)(3).

To prevail on a claim for trade dress infringement under the Lanham Act, Pet Stop must prove:  "(1) that its claimed dress is non-functional; (2) that its claimed dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) that the defendant's product or service creates a likelihood of consumer confusion."  *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F3d 1252, 1258 (9th Cir 2001).  Defendant has moved for summary judgment only on the latter two elements.  Therefore, for purposes of this motion, this court assumes that Pet Stop can prove that its trade dress is non-functional.

**B.    Analysis**

**1.    Distinctiveness/Secondary Meaning**

In order to prove that a trade dress is protected by the Lanham Act, the plaintiff must show that the mark is either distinctive or has acquired a secondary meaning.  *Int'l Jensen*, 4 F3d at 824 (citations omitted).  In making this analysis, "the proper inquiry is not whether individual features of a product are functional or nondistinctive but whether the whole collection of features taken together are functional or nondistinctive."  *Kendall Jackson Winery*, 150 F3d at 1050.  The focus is not "on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create."  *Clicks Billiards*, 251 F3d at 1259.  To do this, one commentator has suggested that "the discrete elements which make up that combination should be separated out and identified in a list."  1 MCCARTHY, § 8.3.

29 - FINDINGS AND RECOMMENDATIONS

As discussed above, an inherently distinctive mark requires no showing of secondary meaning. *Int'l Jensen*, 4 F3d at 824. Trade dress is distinctive when "it identifies the particular source of the product or distinguishes it from other products." *Id*. Conversely, "a product feature whose only impact is decorative and aesthetic, with no source identifying role, cannot be given exclusive rights under trade dress law." 1 MCCARTHY, § 8:1.

If a party cannot prove that its trade dress is inherently distinctive, then it must show that the mark has acquired secondary meaning, or that "the purchasing public associates the mark or dress with a single producer or source rather than with the product itself." *Int'l Jensen*, 4 F3d at 824 (citation omitted). Secondary meaning is defined as "association, nothing more" and has as its "basic element . . . the mental association by a substantial segment of consumers and potential consumers 'between the alleged mark and a single source of the product.'" *Levi Strauss*, 778 F2d at 1354, quoting 1 MCCARTHY, §§ 15:2 and 15:11(B) (additional citations omitted).

### a.    Pet Stop's Trade Dress

Pet Stop's only claimed trade dress is a green Volkswagen Beetle ("Beetle") it purchased and decorated by affixing numerous vinyl stickers on it including: (1) paw prints in a variety of colors which are located on every side of the vehicle; (2) its mark "The Pet Stop;" (3) its trade name "Professional Pet-Sitting Service, LLC;" (4) contact information including its phone number and web-site address, "www.salempetsitter.com;" and (5) brief descriptions of its services. The Pet Stop identifies its trade dress as: "The distinctive decoration and identification on the Pet Stop Beetle . . . including the colors pink, purple, blue green and yellow paw prints. The specific size and shape of the paw prints, the number of paw prints on the car, the size, shape

and color of the text fonts as well as the green color of the car . . . ." *See* Swider Decl. (docket #40), Ex. 4, pp. 2-11.

The parties dispute whether the Beetle is a necessary part of this trade dress. Pet Stop argues that if a vehicle of another make and model had the exact same color and markings it would be immediately recognized as promoting Pet Stop's business. Defendants argue that the Beetle is a key piece of the overall trade dress package claimed by Pet Stop and must be analyzed along with the other elements listed above. This court agrees with both parties.

The analysis must assess the overall visual impression of Pet Stop's claimed trade dress. The make and model of Pet Stop's vehicle is but one factor analysis of the overall visual impression of Pet Stop's claimed dress. Assuming that Pet Stop's Beetle is a protectable trade dress, it is possible a company could so closely conform a vehicle of another make and model to the overall appearance of Pet Stop's Beetle that it would infringe on Pet Stop's mark. It is also possible that another company could use a Volkswagen Beetle in advertising pet-sitting services, but dressed in such a fashion that no possibility of confusion would arise between the two companies. The extent to which a competitor may infringe upon this mark by utilizing variations of Pet Stop's mark is properly addressed by considering the likelihood of confusion.

Thus, this court will include the make and model of Pet Stop's vehicle as one component in the analysis of its trade dress claim.

### b.    <u>Inherently Distinctive</u>

The cases provide some guidance for this court in determining whether Pet Stop's trade dress is inherently distinctive.

In *Taco Cabana*, the Supreme Court held that trade dress can be found "inherently distinctive" without a showing that is has acquired secondary meaning. 505 US at 776. It did not address the question of what makes a trade dress inherently distinctive, but found that the court of appeals was "quite right . . . to follow the *Abercrombie* classifications consistently and to inquire whether trade dress for which protection is claimed under § 43(a) [15 USC § 1125(a)] is inherently distinctive." *Id* at 773.

The Supreme Court has held that a product's color alone is not inherently distinctive, though it could receive trade dress protection upon a showing of secondary meaning. *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 US 159, 162-166 (1995). Analogizing to *Abercrombie*, the Court explained that color was unlike the three inherently distinctive categories of marks "which almost *automatically* tell a customer that they refer to a brand," but that "over time, customers may come to treat a particular color on a product or its packaging . . . as signifying a brand." *Id* at 163 (internal citations omitted).

In 2000, the Supreme Court held that product design trade dress can never be classified as inherently distinctive, finding that "design, like color, is not inherently distinctive." *Wal-Mart,* 529 US at 212. The Court reasoned that unlike product packaging, whose very purpose is "most often to identify the source of the product[,] . . . product design almost invariably serves purposes other than source identification [and] not only renders inherent distinctiveness problematic; it also renders application of an inherent-distinctiveness principle more harmful to other consumer interests," including competition among producers. *Id* at 212-13.

Circuit courts have found some types of trade dress to be inherently distinctive. 1 MCCARTHY, § 8:10 n3 (listing cases). In one instance a court found that an ice cream bar

32 - FINDINGS AND RECOMMENDATIONS

wrapper's use of a "complex composite of size, color, texture and graphics . . . . [created] a

distinctive visual impression" which did not describe the ice cream product inside, but rather

"suggest[ed] to the consumer the coldness of the product." *AmBrit, Inc. v. Kraft, Inc.*, 812 F2d

1531, 1535, 1537 (11th Cir 1986).  Another court reached a similar conclusion with respect to a

product's packaging, explaining that:

> trademark law requires a demonstration of "secondary meaning" only when
> the claimed trademark is not sufficiently distinctive of itself to identify the
> producer . . . .  If the features of the trade dress sought to be protected are
> arbitrary and serve no function either to describe the product or assist in its
> effective packaging, there is no reason to require a plaintiff to show
> consumer connotations associated with such arbitrarily selected features.

*Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.* 659 F2d 695, 702 (5th Cir 1981).

     In contrast, several Ninth Circuit decisions have found a claimed trade dress not to be

inherently distinctive.  While recognizing the possibility of inherently distinctive trade dress,

*Fuddruckers* concluded that "the impression created by a collection of common or functional

elements of restaurant decor" was "simply not the sort of arbitrary or uncommon trade dress that

might qualify as inherently distinctive."  826 F2d at 844.  Similarly *Stephen W. Boney, Inc. v.

Boney Servs.,* 127 F3d 821, 828 (9th Cir 1997), summarily dismissed a claim that the overall

design and layout of a grocery store was inherently distinctive.

     In each of these cases, the determination turned on whether the trade dress serves some

source-identifying, as opposed to product-identifying purpose.  While these cases do provide

guideposts for analysis, none of them squarely addresses the type of trade dress before this court.

Analogizing to these cases, this court's decision turns on whether the Pet Stop's trade dress is

more like the unique product packaging, clearly intended to serve a source-identifying role, at

issue in *Ambrit* and *Chevron*, or the common and functional elements of restaurant decor at issue in *Fuddruckers*.

Viewing the Beetle as a whole, a jury reasonably could find that the Pet Stop Beetle more closely resembles the former because the overall visual impression presented by the Beetle serves a source-identifying role, notwithstanding a few descriptive elements. The shape of the Beetle, its uncommon color, the presence of numerous paw-prints in a variety of colors, and the prominent display of Pet Stop's suggestive marks unmistakably identifies the service provider Pet Stop, not just the types of services it provides.

Judge Posner has cogently remarked that:

> the goal of trademark protection is to allow a firm to affix an identifying mark to its product (or service) offering that will, because it is distinctive and no competitor may use a confusingly similar designation, enable the consumer to discover in the least possible amount of time and with the least possible amount of head-scratching whether a particular brand is that firm's brand or a competitor's brand. The mark need not be the name of the brand; it need not even be a word; it can be a slogan, a symbol, a combination of words and symbols, an ornamental feature, a distinctive shape, or something else intended to remind the consumer of the brand.

*Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc*., 781 F2d 604, 609 (7th Cir 1986) (internal and external citations omitted).

Granting protection to the unique decorations on the Pet Stop's Beetle achieves this goal. Furthermore, there is no evidence that protecting the Pet Stop's design will prevent potential competitors from being able to advertise or describe their products. The inclusion of several decals describing a few of Pet Stop's services moves it closer to the descriptive category along the spectrum of distinctiveness, but the overall impact of each of the Beetle's decorations creates

a unique impression that identifies the source of Pet Stop's services rather than the products themselves.

Defendants go to great lengths to attempt to show that Pet Stop's claimed trade dress is merely generic and, therefore, not protectable as a mark. Distilled to its essence, defendants contend that decorating a car with vinyl stickers is a generic marketing approach. While it may be the case, this does not answer the question of whether the specific marketing at issue here is generic. It is also a generic or common marketing approach to affix symbols to the sides of sneakers, but no one would claim that this renders generic all such trade dress. Defendants' argument is insufficient to demonstrate the lack of a fact issue as to whether Pet Stop's trademark is distinctive. Rather, the evidence shows that Pet Stop designed the vehicle with the express purpose of giving it a source-identifying role. It decorated the Beetle with bright colors, its trademarks and slogans and covered it with multi-colored paw prints. Furthermore it encouraged consumers to "look for the Beetle" on its website. Swider Decl. (docket #40), Ex. 9, p. 35. All these factors would permit a jury to find that the trade dress was distinctive.

### c.    Secondary Meaning

Even if a jury concludes that Pet Stop's trade dress is not inherently distinctive, it reasonably could find that it has acquired secondary meaning. "The trade dress of a product or service attains secondary meaning when the purchasing public associates the dress with a particular source." *Fuddruckers*, 826 F2d at 843 (citation omitted). A number of factors are relevant in making this determination, including: (1) whether customers associate the mark with the producer; (2) the degree and manner of advertising using the mark; (3) the length and manner of use of the mark; and (4) whether use of the mark has been exclusive. *Transgo, Inc. v. Ajac*

35 - FINDINGS AND RECOMMENDATIONS

*Transmission Parts Corp.*, 768 F2d 1001, 1015 (9th Cir 1985).  Also, "proof of copying strongly

supports an inference of secondary meaning."  *Vision Sports*, 888 F2d at 615.

Pet Stop relies on a single piece of evidence in support of the existence of secondary

meaning:  its use of "look for" advertising."  Such advertising "calls the consumer's attention to

the particular feature claimed as trade dress."  1 McCarthy, § 8:8.  Courts have recognized that

such advertising is sufficient to support an inference of secondary meaning.  *DCNL Inc. v. Almar*

*Sales Co.*, 47 USPQ2d 1406, 1414-15 (ND Cal 1997), *affirmed*, 178 F3d 1308 (1998).  However,

this advertising "'must involve 'image advertising,' that is, the ads must feature in some way the

trade dress itself.'"  *Id* at 1414, quoting *First Brands Corp. v. Fred Meyer, Inc.*, 809 F2d 1378,

1383 (9th Cir 1987).  In *Almar Sales*, the court found that the failure of the plaintiff to advertise

the non-functional trade dress features of its product was fatal to its claim that its product design

had acquired secondary meaning as trade dress.  But "[h]ad the promotional activities urged

consumers to, for example, 'look for the wavy vents,' such promotional activities would support

an inference of secondary meaning."  *Id.*

Pet Stop featured its Beetle prominently on a page of its web-site and encouraged

customers to "honk and wave" when they saw it driving around town.  Also on the web page are

multiple picturers which display the Beetle from all angles.  It is clear from this advertisement

that Pet Stop intends customers to associate the overall design and impression of their Beetle with

their business.  This is sufficient to create an issue of fact as to of secondary meaning.

*///*

### d.    <u>Conclusion</u>

Pet Stop has submitted sufficient evidence to create a triable issue of fact on the distinctiveness of its trade dress. A reasonable jury could find that its trade dress is either inherently distinctive or has acquired its distinctiveness through secondary meaning.

It is important to note that the overall design of Pet Stop's Beetle that renders it distinctive, not any one of its individual components. Competitors remain free to use their slogans, contact information, paw prints, and even the color green in advertising their pet-care or pet-sitting services. However, a competitor will not be permitted to copy Pet Stop's design in such a way as to cause consumer confusion. Whether defendants did so in this case is the next issue this court must address.

### 2.    Likelihood of Confusion

The test used for evaluating the likelihood of confusion for trademark infringement applies equally to a claim for trade dress infringement. Courts analyzing trade dress claims have cited both the *Sleekcraft* factors (*see Int'l Jensen*, 4 F3d at 825) and a very similar set of factors listed in *Fuddruckers*, 826 F2d at 845 (*see Clicks Billiards*, 251 F3d at 1265). According to *Fuddruckers*, "[t]he factual elements that make up likelihood of confusion include evidence of actual confusion, the defendant's intent in adopting the mark, similarity of marks, similarity of goods and marketing channels, and the strength of the mark." Likelihood of confusion, again, is a question of fact whose overall focus is whether "'customers viewing the mark would probably assume that the product or service it represents *is associated with the source* of a different product or service identified by a similar mark.'" *Fuddruckers*, 826 F2d at 845, quoting *Lindy Pen Co v. Bic Pen Corp.*, 725 F2d 1240, 1243 (9th Cir 1984) (emphasis in original).

### a.    Defendants' Trade Dress

Pet Stop claims that defendants infringed on their trade dress by decorating a vehicle used to advertise PPSS's services in a manner similar to their Beetle. The offending vehicle was a blue Ford Explorer with vinyl decals on the rear windows which include the two challenged trademarks and two varieties of white paw prints. K. Gennarelli Decl. (docket #40, Ex. 1), ¶ 5; K. Gennarelli Decl. (docket #80), Ex. 2. Ms. Gennarelli also admits to placing the same stickers on a maroon or red sport utility vehicle driven by one of their independent contractors. K. Gennarelli Decl. (docket #40, Ex. 1), ¶ 5. However, Pet Stop has submitted no additional evidence regarding this second vehicle to enable the court to compare it with Pet Stop's trade dress. Therefore, any issue of fact on Pet Stop's trade dress claim must be raised with respect to the first vehicle.

### b.    **Analysis of Factors**

#### i.    **Actual Confusion**

As evidence of actual confusion, Pet Stop submits the declaration of Don Kraus who states that he noticed a car that advertised a pet-sitting service "with a name very similar to [Pet Stop]." Kraus Decl. (docket #62), ¶ 2. "In fact, the name was so close," he continues, "that I thought the car belonged to Ms. Sheehan's business." *Id*. Kraus makes no mention of the paw prints, color, letter font or any other feature of the vehicle that caused his confusion between Pet Stop's and defendants' trade dress. Although his statement may provide further support for Pet Stop's claim for trademark infringement, it provides no support for Pet Stop's claim for trade dress infringement.

#### ii.    **Defendants' Intent**

Pet Stop argues that the timing of the appearance of PPSS's vehicle (shortly after the business deal disintegrated) shows that defendants intended to infringe on Pet Stop's trade dress.

38 - FINDINGS AND RECOMMENDATIONS

Defendants admit that they selected the PPSS name because it was similar to Pet Stop's trade

name, creating an issue of fact on Pet Stop's First Claim.  However, the fact that defendants chose

to advertise their services on a vehicle does not alone show intent to also copy Pet Stop's trade

dress.  Furthermore, defendants have submitted evidence that they changed the advertisement on

their vehicle once they were aware that it could be violating Pet Stop's rights to the use of its

trademarks.  As discussed below, other than the trademarks at issue, the only similarity between

the parties' trade dress is the use of paw prints.  This alone does not support an inference of

intentional copying because defendants used paw prints of an entirely different size, shape, and

variety, and placed them in a distinctly different pattern.  Due to a lack of any evidence that

defendants intentionally copied Pet Stop's *trade dress* as opposed to its trademarks, this element

does not support a likelihood of confusion.

### iii.    Similarity of Marks

A comparison of the parties' trade dresses does not support a finding that a likelihood of

confusion exists.  Other than the offending trademarks, the only other similarity between the two

vehicles is the presence of paw prints.  Furthermore, the paw prints are restricted to the back

windows (not placed all over the vehicle), are smaller, only appear in white, and are comprised of

two separate styles of prints, neither of which match the print pattern used by Pet Stop.  Finally,

the model, make and color of vehicle are different.  Were it not for the use of "petstoppros," or

the similar trade name, nothing about the vehicle would bring Pet Stop to a consumer's mind.

This conclusion is implicit in Kraus's statement.  An analysis of this factor demonstrates that the

trade dress claim is simply a repackaging of Pet Stop's trademark claim.

### iv.    Marketing Channels

39 - FINDINGS AND RECOMMENDATIONS

As discussed above with respect to Pet Stop's trademark claim, the presence of fact issues that cannot be resolved on summary judgment render this factor neutral.

### v.    Strength of the Mark

Pet Stop's trade dress is, at best, suggestive of its services. *See Kendall-Jackson*, 150 F3d at 1048-49 (use of grape leaf design on wine bottle would have been suggestive of product except that its use had become so common that it rendered it generic). For the same reasons discussed with respect to the strength of its trademarks, this factor also weighs against a likelihood of confusion.

### vi.    Additional Factors

Adding the other *Sleekcraft* factors to those identified by *Fuddruckers* does not assist Pet Stop. As discussed above, it is logical to assume that consumers of in-home pet-care services exercise a heightened degree of care in selecting a service provider. Here, it is telling that not a single consumer is identified as having actually utilized the services of Pet Stop or PPSS under the impression that they were utilizing the services of the other. Finally, no evidence shows a likelihood of expansion into any future markets served by Pet Stop. Only the proximity of the parties' services weighs in favor of a finding for Pet Stop.

### c.    Summary of Factors

The only significant similarity between the parties' respective trade dress is the use of the marks at issue in Pet Stop's trademark infringement claim. Otherwise, the overall impression of both parties' trade dress is entirely different. In addition, the weakness of the mark and the lack of evidence of actual confusion or of intentional copying also weigh strongly against a finding of a likelihood of confusion. Without any evidence supporting these key factors, the fact that the

40 - FINDINGS AND RECOMMENDATIONS

parties offered similar services and may have used similar marketing channels is insufficient to show that consumers viewing defendants' trade dress would associate it with Pet Stop's services.

### C.    **Conclusion on Trade Dress Claim**

Because Pet Stop has failed to raise a triable issue of fact on the issue of a likelihood of confusion, defendants' motion should be granted as to Pet Stop's Second Claim alleging trade dress infringement.

## III.    **Contract Counterclaims**

Defendants also move for summary judgment on their counterclaims for breach of contract or anticipatory repudiation.  At oral argument defendants admitted that these were not two separate counterclaims, but two separate theories of the same breach of contract counterclaim and orally withdrew the anticipatory repudiation counterclaim.

///

///

### A.    **Contract Formation**

The formation of a contract requires "'a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.'"  *Ken Hood Const. Co. v. Pac. Coast Constr., Inc.*, 201 Or App 568, 578, 120 P3d 6, 11 (2005), quoting RESTATEMENT (SECOND) OF CONTRACTS, § 17(1) (1981) ("RESTATEMENT 2D"), *opinion adhered to as modified on recons., 203 Or App 768, 126 P3d 1254, *rev denied*, 341 Or 366, 143 P3d 239 (2006).  The existence of an enforceable contract is a question of law, *Key West Retaining Sys., Inc. v. Holm II, Inc.*, 185 Or App 182, 188, 59 P3d 1280, 1283 (2002), *rev den*, 335 Or 402, 68 P3d 231 (2003), but "[q]uestions regarding the intent of the parties are for the factfinder."  *Dalton v. Robert Jahn*

41 - FINDINGS AND RECOMMENDATIONS

*Corp.*, 209 Or App 120, 132, 146 P3d 399, 406 (2006), citing *Bennett v. Farmers Ins. Co.*, 332 Or 138, 157, 26 P3d 785, 797 (2001).

Oregon follows the "objective theory" of contract formation by which the existence of mutual consent is determined by the objective manifestations of the parties' intent as evidenced by their actions. *Ken Hood Const.,* 201 Or App at 578, 12 P3d at 11, citing *Kabil Devs. Corp. v. Mignot*, 279 Or 151, 156, 566 P2d 505, 508 (1977). Under this approach "[m]utual assent may be inferred by the conduct of the parties." *Id* at 579, 12 P3d at 12, citing, *Vtech Commc'ns, Inc. v. Robert Half, Inc*., 190 Or App 81, 86, 77 P3d 1154, 1157 (2003). In many circumstances, a contract may exist absent a written agreement, including where the parties express an intent to commit their agreement to writing in the future. *Id* at 579, 120 P3d at 12, citing RESTATEMENT 2D, § 27. However, this is not the case where the parties express their intent that a formal written contract is a condition precedent to contract formation. *Dalton*, 209 Or App at 135, 146 P3d at 408 (2006), citing *Phillips v. Johnson*, 266 Or 544, 551, 514 P2d 1337, 1341 (1973).

In order to form a contract, there must be a meeting of the minds on the contract's essential terms, or at least some "method agreed upon by which open and disputed terms can be settled, such that nothing is left for future negotiation." *Id* at 132, 146 P3d at 406, citing *Phillips,* 266 Or 544 at 555-56, 514 P2d at 1343. However a contract also may be formed despite the fact that "the parties intended to iron out the details before signing the formal contract." *Ken Hood Const.,* 201 Or App at 580, 120 P3d at 12. "[P]arties who agree on the essential terms of a contract may intend those terms to be binding and, at the same time, implicitly agree to bargain in good faith on the remaining terms. That fact does not prevent a court from enforcing the parties'

agreement." *Id*, 120 P3d at 13, quoting *Hughes v. Misar*, 189 Or App 258, 266, 76 P3d 111, 116 (2003).

The undisputed facts show that by October 31, 2006, at the latest, the parties had agreed on all the essential terms of the contract including the price, the date of transfer, the property and service accounts of Pet Stop to be transferred, the date that Pet Stop's business accounts would be transferred into defendants' name, and a payment plan for the remainder of the purchase price. These terms are clearly expressed in a series of emails in September, October and November of 2006. The remaining discussions in the emails concern minor details of performance, such as training, changing the email address, domain name and altering the website and a number of other items necessary for a smooth transition in ownership to take place on January 1, 2007. Indeed, in the final email, dated October 31, 2006, Ms. Sheehan conveyed that she was "going to start letting the businesses I work with know about the sale now."

The only issue is whether a formal written agreement was a condition precedent to forming a valid, enforceable contract. The facts reveal that the Sheehans hired an attorney to draft the sale contract and that the parties had an appointment with that attorney to sign a written contract on December 29, 2006. Swider Decl., (docket #40), Ex. 12. Although weak, this is sufficient evidence to create an issue of fact as to whether the parties had a valid and enforceable contract prior to signing a formal written agreement.

Even assuming that the parties had a valid and enforceable contract by October 31, 2006, defendants' counterclaim nevertheless fails, as discussed below.

B.       **Breach/Anticipatory Repudiation**

To prevail on their breach of contract counterclaim, defendants must prove that Pet Stop failed to perform a duty owed them under a valid and enforceable contract. *Kantor v. Boise Cascade Corp.*, 75 Or App 698, 703, 708 P2d 356, 359 (1985), *rev denied*, 300 Or 506, 713 P2d 1058 (1986). Ordinarily a party is not in breach of a contract unless and until it fails to perform a duty at the time it comes due. *Id* ("A cause of action for breach of contract accrues when the contract is breached."). This is true even when a party to a contract expresses some hesitancy about its willingness or ability to perform according to the terms of the contract. However,

> [i]f a party to a contract clearly and unequivocally signifies before his performance is due that he will not perform, the second party has the option of treating the contract as breached and bringing an action, without tendering performance or awaiting the time that the first party's performance would be due.

*Jitner v. Gersch Dev. Co.*, 101 Or App 220, 224, 789 P2d 704, 706 (1990) (citation omitted).

The expression of intent not to perform must be unequivocal. "[B]efore a party to an executory contract may be said to have anticipatorily breached the same he must refuse by acts or deeds [to] perform his obligations under the contract positively, unconditionally, unequivocally, distinctly and absolutely." *Id* (alterations in original), quoting *Swick v. Mueller et ux.*, 193 Or 668, 676, 238 P2d 717, 720 (1952).

Ms. Sheehan's November 4, 2006 email unequivocally expressed her intent not to perform her portion of the executory contract under the terms agreed upon as of October 31, 2006. She clearly stated that the deal could only go forward upon defendants' acceptance of changes to several material terms, including the amount due at signing and the date of transfer. She presented these new terms as a take-it-or-leave-it offer and stated that should defendants refuse these new terms, she would no longer go forward with the deal.

44 - FINDINGS AND RECOMMENDATIONS

C.      **Election of Remedy**

When a party anticipatorily breaches a contract, the injured party has the option of either

treating the contract as breached and bringing an action "at once" or awaiting the time when

performance is due and then seeking remedies for breach.  *Wilson v. Western Alliance Corp.*, 78

Or App 197, 201, 715 P2d 1344, 1346 (1986), quoting *Dibble v. Hodes Co.*, 132 Or 596, 606, 286

P 554, 557 (1930).  At the time of the repudiation, the non-breaching party may

> elect between the following remedies:  (1) To rescind the contract and
> pursue the remedies based on such a rescission. (2) To treat the contract as
> still binding and wait until the time arrives for its performance, and at such
> time to bring an action on the contract for breach. (3) To treat the
> renunciation as an immediate breach and sue at once for any damages
> which he may have sustained.

*Dibble*, 132 Or at 606, 286 at 557, quoting 13 CJ at 653.

The election of a rescission remedy necessarily precludes later recovery on a theory of

breach.  *Sheppard v. Blitz*, 177 Or 501, 508-09, 163 P2d 519, 522-23 (1945); *see also Eulrich v.

Snap-On Tools Corp.*, 121 Or App 25, 41, 853 P2d 1350, 1360 (1993) ("a party may not affirm

and rescind a contract at the same time"), *vacated on other grounds*, 512 US 1231 (1994).

However, "a repudiation of an executory contract does not operate as a breach until it is

treated as a breach by the injured party."  *Wilson*, 78 Or App at 201, 715 at 1346.  This is

determined objectively by looking at the acts and communications of the parties.  The non-

breaching party must, however, make its election whether to seek rescission within a reasonable

time.  *Nimrod Park, Inc. v. Rose*, 265 Or 221, 222-223, 508 P2d 183, 184 (1973) ("It is well

established that one who would rescind a contract must do so within a reasonable time after

discovery of facts constituting grounds for rescission.") (citations omitted).

The objective actions by defendants after Ms. Sheehan's repudiation show that they chose the option of rescission. Ms. Sheehan proposed the option of rescission in her November 4, 2006, email. In the mid-November series of emails and text messages between Ms. Sheehan and Mr. Gennarelli, defendants repeatedly demanded their deposit back. Shortly thereafter they received their deposit and returned to Ms. Sheehan the property of Pet Stop in their possession. During this time period, they also began operating their own separate business providing in-home pet-care and pet-sitting services.

Defendants argue that by demanding their deposit back, they were not seeking rescission, but were attempting to mitigate their damages. The facts do not support this argument. Instead, they show that defendants sought to withdraw completely from the business deal with the Sheehans by demanding their deposit back and returning property that would have become theirs upon completion of the business transaction. These acts are inconsistent with an intent to enforce the contract.

Defendants' own words betray their argument. On November 18, 2006, the Gennarellis sent an email to Ms. Sheehan in response to her delay in returning their deposit. They wrote: "Our expectation is that we receive a cashiers check for $5,000.00 by 11/30/06. If we do not receive our $5,0000 [*sic*] deposit we will move forward with our planned legal action against your company and you personally." K. Gennarelli Decl. (docket #68), Ex. 3, p. 14. Defendants received the check the next day and brought no legal action until filing the counterclaim at issue here.

### D.    <u>Conclusion</u>

The undisputed facts show that defendants elected rescission of the contract in the face of Pet Stop's anticipatory repudiation. Having sought to avoid the contract, they cannot now seek to

affirm it.  As a result, defendants' motion for summary judgment on their counterclaim for breach of contract should be denied, and the court should *sua sponte* grant summary judgment to plaintiffs on defendants' counterclaims.

## RECOMMENDATIONS

(1)  Pet Stop's Motion for Summary Judgment on its First Claim for trademark infringement (docket #42) should be GRANTED with respect to the distinctiveness of its trademarks, but otherwise DENIED;

(2)  Defendants' Motion for Summary Judgment (docket #39) should be GRANTED with respect to Pet Stop's Second Claim for trade dress infringement, but otherwise DENIED; and

(3) Summary judgment should be GRANTED in favor of Pet Stop *sua sponte* on defendants' counterclaims for breach of contract and anticipatory repudiation.

As a result, only the issue of likelihood of confusion on Pet Stop's First Claim for trademark infringement, and possibly the Third and Fourth Claims if not voluntarily dismissed by plaintiffs, remain for trial.

## SCHEDULING ORDER

Objections to these Findings and Recommendations, if any, are due May 16, 2008.  If no objections are filed, then the Findings and Recommendations will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendations will be referred to a district judge and go under advisement.

DATED this 1st day of May, 2008.

/s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge